IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:18-CV-366-FL

| | |
|---|---|
| JAMES ALLEN POINDEXTER, JERRY JONES, GREGORY HOLT, and CONSTITUTION PARTY OF NORTH CAROLINA, | ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| KIM WESTBROOK STRACH, in her official capacity as the Executive Director of the North Carolina State Board of Elections and Ethics Enforcement, | ) ) ) ) ) ) |
| Defendant. | ) |

ORDER

This matter is before the court on plaintiffs' motion for preliminary injunction. (DE 10). The issues raised have been briefed fully, and in this posture, plaintiffs' motion is ripe for ruling. For the reasons stated below, plaintiffs' motion for preliminary injunction is granted.

## STATEMENT OF THE CASE

Plaintiff Constitution Party of North Carolina and its candidates, plaintiffs James Allen Poindexter ("Poindexter"), Jerry Jones ("Jones"), and Gregory Holt ("Holt"), filed suit on July 20, 2018, against defendant Kim Westbrook Strach, in her official capacity as the Executive Director of the North Carolina State Board of Elections and Ethics Enforcement ("Board"), alleging N.C. Gen. Stat. § 163A-953, as recently amended by 2018 North Carolina Session Law 2018-13, § 3.4, effective June 20, 2018, ("S.L. 2018-13"), is unconstitutional as applied to plaintiffs in that this recently enacted law has been applied retroactively, removing plaintiffs from the ballot for the

upcoming North Carolina general elections in 2018 where plaintiffs were otherwise qualified and had been approved to appear on the ballot. Plaintiffs challenge the legislation on the grounds that it violates plaintiffs' rights of free speech and association as protected by the First and Fourteenth Amendments to the Constitution and rights of due process under the Fourteenth Amendment to the Constitution. Plaintiffs seek injunctive and declaratory relief pursuant to 42 U.S.C. § 1983 and 28 U.S.C. § 2201.

On August 7, 2018, plaintiffs filed the instant motion for preliminary injunction, seeking "preliminary injunction against Defendant prevent the removal of Plaintiff's and its candidates: Plaintiffs Poindexter, Jones, and Holt from North Carolina's general elections ballots and prohibit the retroactive application of Senate Bill 486/ N.C. Sess. Law 2018-13 (Section 3.4) to Plaintiffs and their ballot access for North Carolina's 2018 general election." (DE 11 at 19).

On August 9, 2018 plaintiffs filed motion to expedite consideration of plaintiffs' motion for preliminary injunction and request for hearing. That afternoon the court held a Federal Rule of Civil Procedure 16 status conference wherein the court granted plaintiffs' motion to expedite, directing defendant to respond to plaintiffs' motion by August 14, 2018, which defendant timely filed.[1] Plaintiffs filed reply on August 15, 2018, and also filed motion for temporary restraining order on August 16, 2018, seeking temporary restraining order enjoining defendant from "printing ballots, to the extent required if there is not enough time for decision on Plaintiff's motion for preliminary injunction based upon the contents of orders in the state court actions . . . and arguments of counsel." (DE 20 at 1).

---

[1] As stated above, the parties have fully briefed the motion, and the court determines that hearing is not necessary. See Local Rule of Civil Procedure 7.1(j) ("Hearings on motions may be ordered by the court in its discretion. Unless so ordered, motions shall be determined without a hearing.").

On August 13, 2018, defendant filed notice informing the court that separate motions for preliminary injunction impacting the 2018 North Carolina election ballot were heard in Superior Court for Wake County, in two civil matters: Anglin v. Berger et al., 18-CVS-9748, and Edwards v. NC State Board of Elections et al., 18-CVS-9749. (DE 17). Orders filed in those cases in the afternoon of August 13, 2018, inter alia, enjoin the Board from printing election ballots that do not include the party designation of two judicial candidates. (See DE 17.1, DE 17.2). Defendant also advised the court that two other matters addressing the legal status of certain proposed amendments to the North Carolina Constitution were scheduled to be argued before a three-judge panel on August 15, 2018 and that those matters also may impact when the Board may print election ballots. (DE 17).[2]

## STATEMENT OF THE FACTS

The parties do not disagree on the material facts. On or about June 6, 2018, the Constitution Party of North Carolina became a recognized political party under the elections laws of North Carolina. (Compl. (DE 1) ¶ 10). The Constitution Party of North Carolina, through its representatives, timely filed with the Board more than the required amount of petition signatures, as well as more than 200 signatures from more than three congressional districts. (Id.). The Board then voted unanimously to recognize the Constitution Party of North Carolina as the state's newest political party. (Id.).

---

[2] By order on injunctive relief, issued August 21, 2018, the three-judge panel granted motion for preliminary injunction, directing the Board from "preparing any ballots . . . for the November 2018 general election containing the Ballot Question language currently contained in Section 5 of Session Law 2018-117" and "Section 6 of Session Law 2018-118," two proposed amendments to the North Carolina Constitution. See Cooper v. Berger, No. 18-CVS-9805 (N.C. Super. Ct. Wake County August 21, 2018); North Carolina State Conference of the National Association for the Advancement of Colored People v. Moore, No. 18-CVS-9806 (N.C. Super Ct. Wake County August 21, 2018) at 29-30 (unpublished).

3

Until June 6, 2018, this party did not have access to the ballot in North Carolina and could not nominate candidates. (Id.). Likewise, voters could not register to vote as a Constitution Party of North Carolina voter. (Id. ¶ 11). Prior to this party becoming recognized under the elections laws of North Carolina, no voter in North Carolina could affiliate with the party in that voter's registration. (Id. ¶ 12).

Primary elections in North Carolina for 2018 occurred on May 8, 2018 with options for second primaries occurring after June 27, 2018, or July 17, 2018. (Id. ¶ 13). Prior to the ballot access recognition of the Constitution Party of North Carolina, plaintiff Poindexter ran for the office for North Carolina House of Representatives, District 90, in the Republican Party primary election and lost. (Id. ¶ 14). Similarly, plaintiff Holt ran for office for Craven County Board of Commissioners, District 1, in the Republican Party primary election and lost. (Id. ¶ 15). Finally, plaintiff Jones ran for office for Greene County Board of Commissioners, District 3, in the Democratic Party primary election and lost. (Id. ¶ 16).[3]

Pursuant to the election laws governing newly recognized parties, the Constitution Party of North Carolina was not permitted to participate in the primary elections and was required to nominate its candidates by convention. (Id. ¶ 17). After the Constitution Party of North Carolina held its convention, it submitted its candidate list, which included plaintiffs Poindexter, Jones, and Holt. (Id. ¶ 18). The candidates were accepted by the Board. (Id.).[4]

---

[3] Defendant alleges that plaintiff Jones was previously affiliated with the Republican, not Democratic, party. (DE 18 at 2). This distinction is not material to the court's present analysis.

[4] Consistent with the parties' arguments, the court presumes this acceptance means that these candidates were approved to be on the ballot for the forthcoming 2018 election.

On or about June 5, 2018 the North Carolina General Assembly passed Senate Bill 486, "An Act to Make Various Changes Related to Election Laws," that in part modified the provisions of the election law governing the participation of new political parties in the general election. (Id. ¶ 19). The bill went to the Governor for signing or for veto. (Id.). On or about June 15, 2018, the Governor vetoed Senate Bill 486, stating "[c]ontinued election meddling for partisan advantage weakens public confidence." (Id.).

The North Carolina General Assembly, on or about June 20, 2018, overrode the Governor's veto and passed Senate Bill 486 into law as S.L. 2018-13. (Id. ¶ 20). S.L. 2018-13 states in pertinent part that

> An individual whose name appeared on the ballot in a primary election preliminary to the general election shall not be eligible to have that individual's name placed on the general election ballot as a candidate for the new political party for the same office in that year.

(Id. ¶ 21(citing S.L. 2018-13)).

Thereafter, on or about June 21, 2018, the Board decertified candidates Poindexter, Jones, and Holt. (Id. ¶ 22).

The statewide general election for both state and federal offices will be held on November 6, 2018. State law requires that the Board provide absentee ballots "60 days prior to the statewide general election in even-numbered years." (DE 18 at 3 (citing N.C. Gen. Stat. § 163A-1305)).[5] Defendant alleges that in order for the ballots to be properly prepared prior to making absentee ballots available to voters by September 7, 2018, 60 days prior to the November election,

---

[5] Additionally, the Uniformed and Overseas Citizens Absentee Voting Act and the Military and Overseas Voter Empowerment Act require that ballots be made available no later than 45 days before an election involving a federal office. (DE 18 at 3 (citing 52 U.S.C. 20302(a)(8)(A))).

preparation and testing that normally takes approximately 30 days must be completed, although defendant has indicated to the court that truncated preparation and testing can occur. (Id.).

## DISCUSSION

A.  Standard of Review

Rule 65 of the Federal Rules of Civil Procedure allows a court to enter preliminary injunctive relief prior to adjudication on the merits of the action. Fed. R. Civ. P. 65(a). A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." Winter v. Natural Res. Def. Council, Inc, 555 U.S. 7, 22 (2008). To obtain a preliminary injunction, plaintiff must establish four requirements: (1) likelihood of success on the merits; (2) likelihood of irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in plaintiff's favor; and (4) that an injunction is in the public interest. Id. at 20; see also Real Truth About Obama, Inc. v. Federal Election Comm'n, 575 F.3d 342, 346 (4th Cir. 2009), vacated on other grounds, 130 S. Ct. 2371 (2010), reinstated in relevant part on remand, 607 F.3d 355 (4th Cir. 2010) (per curiam).

B.  Analysis

1.  Likelihood of Success on the Merits

The court begins with determining the appropriate level of scrutiny of the legislation recently enacted. "It is well established that ballot-access restrictions 'implicate substantial voting, associational and expressive rights protected by the First and Fourteenth Amendments.'" Pisano v. Strach, 743 F.3d 927, 933 (4th Cir. 2014) (citing McLaughlin v. N.C. Bd. of Elections, 65 F.3d 1215, 1221 (4th Cir.1995)). In analyzing whether state election laws impermissibly infringe on such rights, the Supreme Court has instructed courts to weigh

6

> "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights."

Id. (citing Anderson v. Celebrezze, 460 U.S. 780, 789 (1983); Burdick v. Takushi, 504 U.S. 428, 434 (1992)) (hereinafter referred to as the "Anderson/Burdick framework").

In applying the Anderson/Burdick framework, the court in Pisano noted "we have stated that election laws that impose a severe burden on ballot access are subject to strict scrutiny, and a court applying strict scrutiny may uphold the restrictions only if they are 'narrowly drawn to advance a state interest of compelling importance.'" Id. (citing McLaughlin, 65 F.3d at 1220). On the other hand, "if a statute imposes only modest burdens, then a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions." Id. (citing S.C. Green Party v. S.C. State Election Commn., 612 F.3d 752, 756 (4th Cir. 2010)).

Defendant argues that plaintiffs have not asserted a claim under the Anderson/Burdick line of cases in that plaintiffs do not contend that S.L. 2018-13 is unconstitutional in its prospective application, only in its retroactive application under the Due Process Clause. (DE 18 at 8 n.3). Plaintiffs disagree, arguing they have asserted both a Due Process challenge in addition to their as-applied challenge to S.L. 2018-13, stating that "the passage and enforcement of N.C. Sess. Law 2018-13 constitutes a severe burden to Plaintiffs['] rights triggering strict scrutiny under the Anderson framework because it make it impossible for Plaintiffs to exercise their rights in the 2018 election." (DE 19 at 4 (emphasis in original)).

Although the current situation presents a unique concern, the court discerns no principled reason wherein the Anderson/Burdick line of cases does not apply to the instant case simply because

7

plaintiffs' challenge to the relevant legislation is solely as to its retroactive, not prospective, application. As stated by the Fourth Circuit

> As a rule, state laws that restrict a political party's access to the ballot <u>always</u> implicate substantial voting, associational and expressive rights protected by the First and Fourteenth Amendments. That is because "it is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech," <u>Anderson</u>, 460 U.S. at 787, 103 S.Ct. at 1569 (internal quotation omitted), and because "[t]he right to form a party for the advancement of political goals means little if a party can be kept off the election ballot and thus denied an equal opportunity to win votes." <u>Williams v. Rhodes</u>, 393 U.S. 23, 31, 89 S.Ct. 5, 10–11, 21 L.Ed.2d 24 (1968) . . . .

<u>McLaughlin</u>, 65 F.3d at 1221 (emphasis added); <u>id.</u> ("When facing <u>any</u> constitutional challenge to a state's election laws, a court must first determine whether protected rights are severely burdened.") (emphasis added).

Defendant cites in support <u>Wilson v. Birnberg</u>, 667 F.3d 591, 598–99 (5th Cir. 2012), where the court held the <u>Anderson/Burdick</u> line of cases inapplicable. However, in <u>Wilson</u>, the plaintiff did not appear on the ballot at issue, "[did] not seek to use [the <u>Anderson/Burdick</u>] doctrine to challenge the constitutionality or a statute or election rule," and did not argue the requirement of the statute at issue, "compelling a candidate to list his residential address on his application[,] is an improper burden." <u>Id.</u> Additionally, <u>Wilson</u> did not concern the retroactive application of an newly-enacted election rule during an election cycle.

Here, plaintiffs were accepted to be placed on the ballot, and plaintiffs constitutionally challenge the burden of the newly-enacted statutory requirement as retroactively applied to them. First, it is undisputed that in early June the Constitution Party of North Carolina became a recognized political party under the elections laws of North Carolina, that the Constitution Party of North Carolina, through its representatives, timely filed with the Board more than the required

8

amount of petition signatures, and that the Board then voted unanimously to recognize the Constitution Party of North Carolina as the state's newest political party. (Compl. (DE 1) ¶ 10; see also DE 18 at 2). It is additionally undisputed that after the Constitution Party of North Carolina held its convention and submitted its candidate list, which included plaintiffs Poindexter, Jones, and Holt, and these candidates were accepted by the Board. (Compl. (DE 1) ¶ 10; see also DE 18 at 2). Finally, following the enactment of S.L. 2018-13, these candidates were no longer accepted by the Board and were informed their names "will not appear on the ballot and the [Board] will begin the process of returning your respective filing fees." (Compl. (DE 1) ¶ 22; DE 18 at 2).

Second, the First and Fourteenth Amendment rights which plaintiffs seek to vindicate through their constitutional challenge to S.L. 2018-13 are 1) the voters' rights to vote for the candidates of their choice, 2) plaintiff Constitution Party of North Carolina's right to file the candidates that it nominated and approved of at its convention, 3) plaintiffs' associational rights, and 4) plaintiffs' due process rights. (See Compl. (DE 1) ¶¶ 24, 25, 28, 29, 44); see also Duke v. Smith, 13 F.3d 388, 394 (11th Cir. 1994) (finding plaintiffs seek to vindicate similar rights and directing "[t]hese rights must be weighed against the interests put forward by the state as justifications for the burden imposed by the reconsideration procedure.").[6]

---

[6] The court rejects defendant's argument that "it is questionable whether Plaintiffs have asserted an actionable claim under the Due Process Clause." (DE 18 at 8). Defendant cites in support Snowden v. Hughes, 321 U.S. 1, 7 (1944), which held that a candidate to an elected office does not have a property or liberty interest protected by the Due Process Clause of the Fourteenth Amendment. However, plaintiffs do not assert a property or liberty interest in the offices sought themselves, but in the ability to appear on the ballot. See Briscoe v. Kusper, 435 F.2d 1046, 1053 (7th Cir. 1970) ("It is apparent from the opinions of the Supreme Court in both Snowden and Taylor & Marshall that the rights in question were presented as purely state rights to public employment and were narrowly considered . . . . In this instance, we perceive the complaint of these candidates and voters as transcending mere assertion of state-created rights. The thrust of their challenge to the Board's action rests upon the effect which denial of ballot placement has upon their enjoyment of rights of free association and petition for the redress of grievances.").

9

Here, the retroactive application of S.L. 2018-13 imposes a severe burden on plaintiffs' constitutional rights in that plaintiffs are prevented from running in the general election, whereas prior to the enactment of S.L. 2018-13, plaintiffs were accepted to appear on the ballot, and no process was afforded plaintiffs whereby they could challenge their decertification.[7] Thus, the court concludes that strict scrutiny is called for in the examination of S.L. 2018-13 because the restriction at issue has a real and appreciable impact the Constitutional Party of North Carolina, the individual candidates, and on those citizens and voters who organized and supported both the party and candidates. See McLaughlin, 65 F.3d at 1221–22 ("Moreover, the burden that North Carolina's ballot access restrictions impose on protected interests is undoubtedly severe—that is, as history reveals, those regulations make it extremely difficult for any 'third party' to participate in electoral politics."); see also id. at 1222 n.7 ("as we previously have observed, strict scrutiny can apply to laws which 'mak[e] it difficult, but not impossible, for a new political party to obtain a position on the ballot.'") (citing Greidinger v. Davis, 988 F.2d 1344, 1352 (4th Cir.1993)).

Turning to the state's justifications for the enactment of S.L. 2018-13, defendant argues that "sore loser" laws, such as S.L. 2018-13, have ordinarily been upheld against constitutional challenges as laws that promote legitimate state interests. However, this argument is inapposite in the present case. All parties to this suit recognize the ability of the North Carolina legislature to enact a disaffiliation or "sore loser law" constitutionally. See, e.g., Backus v. Spears, 677 F.2d 397,

---

[7] Defendants assert in footnote that "[f]or the sake of analytical convenience, Defendant assumes but does not concede herein that SL 2018-13 was intended to be retroactive. That determination, however, is also required." (DE 18 at 4n.2 (citing Landgraf v. Usi Film Prods., 511 U.S. 244, 280 (1994)). In Landgraf, the Supreme Court directs that "the court must ask whether the new provision attaches new legal consequences to events completed before its enactment," but also cautions that "[t]he conclusion that a particular rule operates 'retroactively' comes at the end of a process of judgment concerning the nature and extent of the change in the law and the degree of connection between the operation of the new rule and a relevant past event." 511 U.S. at 269-270. Here, at this time, it appears likely that the law at issue is retroactive as to plaintiffs in that it attaches new legal consequences to events completed before its enactment.

10

399 (4th Cir. 1982) ("Under Storer v. Brown, 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974), South Carolina certainly has the power, as a permissible adjunct to promoting orderly primary elections, to forbid petition candidacies by persons who have been defeated in party primaries."); Storer, 415 U.S. at 736 ("It appears obvious to us that the one-year disaffiliation provision furthers the State's interest in the stability of its political system. We also consider that interest as not only permissible, but compelling and as outweighing the interest the candidate and his supporters may have in making a late rather than an early decision to seek independent ballot status.").

Here, however, the concern is not about the legislator's ability to enact prospective sore loser laws but the retroactive application and impact of this law on plaintiffs' rights. This concern is not addressed in cases cited by defendant in support of the state's justification for the enactment of S.L. 2018-13. Defendant has not provided, nor is the court aware, of any legislation that has been found constitutionally sound when enacted during an election cycle that disqualifies previously qualifying candidates from appearing on a ballot.

When faced with a somewhat similar situation, the court in Libertarian Party of Ohio granted plaintiffs' request for preliminary injunction stating:

> Defendants' arguments go to the merits of whether S.B. 193 imposes severe burdens on ballot access prospectively. That a law may be valid when it is applied prospectively does not mean its retroactive application satisfies due process. [Eastern Enterpises v. Apfel, 524 U.S. 498, 547-48 (1998)]. The issue is not whether Plaintiffs have a specific constitutional right to appear on the primary ballot. Rather, it is whether due process fairness requires them to be placed on the 2014 primary ballot in these circumstances. The circumstances here include the Secretary's directives which indicated Plaintiffs could qualify for the primary ballot, Plaintiffs' expenditure of significant time and resources to qualify, and Plaintiffs' legitimate expectation that, having complied with the process that was (and remains) in place, they would have the opportunity to reap the political benefits of participating in the primary. The Ohio Legislature moved the proverbial goalpost in the midst of the game. Stripping Plaintiffs of the opportunity to participate in the 2014 primary in these circumstances would be patently unfair.

11

Libertarian Party of Ohio v. Husted, 2:13-CV-953, 2014 WL 11515569, at *7 (S.D. Ohio Jan. 7, 2014) (emphasis in original); Hudler v. Austin, 419 F. Supp. 1002, 1014 (E.D. Mich. 1976), aff'd sub nom. Allen v. Austin, 430 U.S. 924 (1977) (finding "Act 94 is a proper exercise of legislative direction . . . except as to its application" to the upcoming election, stating "defendants are hereby directed to take such steps as are necessary to place on the November ballot all parties who would have been eligible based upon compliance with the pre-existing petition requirement"); Briscoe, 435 F.2d at 1055 ("Regardless of whether the more restrictive position of the Board was statutorily or constitutionally valid, the application of the new anti-duplication rule to nullify previously acceptable signatures without prior notice was unfair and violated due process."); see also Ayers-Schaffner v. DiStefano, 37 F.3d 726, 730 (1st Cir. 1994) ("The long line of cases upholding ballot access requirements are patently inapplicable, as limiting candidates through reasonable advance requirements provides no justification for the retroactive restriction of the right to vote.").

Defendant admits that "[t]he wrinkle in this case at hand is that SL 2018-13 applies to candidates of new parties, which have not been an issue in North Carolina prior to the current election cycle." (DE 18 at 10). Defendant argues, however, that "SL 2018-13 was nothing more than a logical extension of the established 'sore loser' statute in that it prevented 'sore loser' candidates from taking advantage of new parties in their first year of recognition." (Id.).

The issue at hand is more than a "wrinkle." Under defendant's reasoning, a legislature would be empowered to retroactively alter any election rule, no matter how minor, and disqualify any candidate, even after that candidate had fulfilled the requirements in effect at the relevant time, as long as that election rule would prospectively pass constitutional muster. Such erratic execution of

12

election laws is inconsistent with the well-established state interest "in ensuring orderly, fair, and efficient procedures for the election of public officials." S.C. Green Party, 612 F.3d at 759.

Finally, defendant offers no justification as to how retraction of the Board's acceptance of these candidates to appear on the ballot in the midst of an election cycle is the least restrictive means to achieve the state's interest. See, e.g., McLaughlin, 65 F.3d at 1221–22 (citing Jenness v. Fortson, 403 U.S. 431, 442 (1971)) ("It remains only to determine, then, whether the North Carolina rules that govern a party's ability to place its candidates on the general election ballot are the least restrictive means to achieve the 'important state interest in requiring some preliminary modicum of support before printing the name of a political organization's candidate on the ballot—the interest, if no other, in avoiding confusion, deception, and even frustration of the democratic process at the general election.'").

Accordingly, plaintiffs have established likelihood of success on the merits that S.L. 2018-13, as applied to plaintiffs, impermissibly infringes on plaintiffs' constitutional rights.

2.  Likelihood of Irreparable Harm

Because of the loss of constitutional freedoms, plaintiffs will be irreparably harmed if S.L. 2018-13 was followed for this election and then thereafter found unconstitutional. See, e.g., Elrod v. Burns, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time unquestionably constitutes irreparable injury."); Tashjian v. Republican Party of Connecticut, 479 U.S. 208, 214 (1986) ("It is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech.") (citing NAACP v. Alabama ex rel. Patterson, 357 U.S. 449, 460 (1958)); Kusper v. Pontikes, 414 U.S. 51, 57 (1973)

("The right to associate with the political party of one's choice is an integral part of this basic constitutional freedom."); League of Women Voters of N. Carolina v. North Carolina, 769 F.3d 224, 247 (4th Cir. 2014) ("Courts routinely deem restrictions on fundamental voting rights irreparable injury . . . . And once the election occurs, there can be no do-over and no redress. The injury to these voters is real and completely irreparable if nothing is done to enjoin this law.").

Defendant argues, however, that plaintiffs' delay in seeking relief is inconsistent with their claim that they will suffer irreparable harm, where plaintiffs waited a month after the enactment of S.L. 2018-13 to file suit and waited weeks after that to seek injunctive relief. Defendant also appears to raise the equitable defense of laches, which "imposes on the defendant the ultimate burden of proving (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense." White v. Daniel, 909 F.2d 99, 102 (4th Cir. 1990) (citations omitted).

First, a laches defense is unsupportable in this case where defendant has suffered no prejudice. As admitted by defendant, "[b]ut for other suits filed in the North Carolina Superior Court, the ballots for the November election would have already been in the process of preparation." (DE 18 at 3). However, because of those other suits, and the temporary restraining orders and preliminary injunctions issued in those suits, defendant has not begun the process of preparation and therefore has not suffered prejudice by plaintiffs' delay.

But this is not the end of the inquiry. As stated by the Fourth Circuit,

> Although a particular period of delay may not rise to the level of laches and thereby bar a permanent injunction, it may still indicate an absence of the kind of irreparable harm required to support a preliminary injunction. The Associations' delay is thus quite relevant to balancing the parties' potential harms. Since an application for preliminary injunction is based upon an urgent need for the protection of [a]

14

Plaintiff's rights, a long delay in seeking relief indicates that speedy action is not required. Quince Orchard Valley Citizens Ass'n, Inc. v. Hodel, 872 F.2d 75, 80 (4th Cir. 1989) (citations omitted).

Here, although plaintiffs' delay is a relevant consideration, the court does not find it dispositive. See, e.g., Nader 2000 Primary Comm., Inc. v. Hechler, 112 F. Supp. 2d 575, 579 n.2 (S.D.W. Va. 2000) (holding in response to a laches argument that "[o]rdinary citizens should not be forced to anticipate and predict possible constitutional violations and be burdened with protecting against them, on pain of losing their rights" and that "[r]egistered voters in West Virginia should not have to sacrifice First Amendment rights because the State interposed unconstitutional requirements on individuals seeking ballot access, even when such individuals may have failed to act with dispatch to challenge the law").

The court finds plaintiffs have established a likelihood of irreparable harm.

3. Balance of Equities and Public Interest

Plaintiffs have shown the balance of equities tips in their favor and the public interest is best served by issuance of preliminary injunction in this instance.

Plaintiffs have suffered harm to their constitutional rights, and defendant has offered no argument or evidence of injury to the rights of voters or the state of North Carolina should defendant be enjoined, other than a generalized concern that granting plaintiffs' motion "will likely serve to delay the production of those ballots," "particularly in the districts plaintiffs wish to run." (DE 18 at 12).

However, defendant has yet to print the ballots at issue and returning the parties to the same position that they were in on June 19, 2018, after defendant had accepted the plaintiffs as candidates

15

for the Constitution Party of North Carolina and prior to the enactment and enforcement of S.L. 2018-13, is in the public interest as well as favors plaintiffs with regard to the balance of equities. See League of Women Voters, 769 F.3d at 248 (citing Newsom v. Albemarle Cnty. Sch. Bd., 354 F.3d 249, 261 (4th Cir.2003)) ("upholding constitutional rights serves the public interest").[8]

4. No Security Requirement

Rule 65 specifies that a "court may issue a preliminary injunction . . . only if the movant gives security." Fed.R.Civ.P. 65(c). However, "the district court retains the discretion to set the bond amount as it sees fit or waive the security requirement." Pashby v. Delia, 709 F.3d 307, 332 (4th Cir. 2013). Here, plaintiffs' request for waiver of the security requirement is unopposed by defendant, and the court in its discretion waives said requirement.

**CONCLUSION**

For the foregoing reasons, plaintiffs' motion for preliminary injunction is GRANTED. (DE 10). Defendant is ENJOINED during the pendency of this litigation from enforcing S.L. 2018-30 against plaintiffs or otherwise issuing or causing any applicable county Board of Elections to issue any official state publication to the voting public which does not have plaintiffs Poindexter, Jones,

---

[8] Defendant argues this court may abstain from issuing a first impression opinion that interprets S.L. 2018-13, invoking the abstention doctrine as first articulated by the Supreme Court in RR Comm. of Tex. v. Pullman Co., 312 U.S. 496 (1941). (DE 18 at 12-14). However, "Pullman abstention requires federal courts to abstain from deciding an unclear area of state law that raises constitutional issues because state court clarification might serve to avoid a federal constitutional ruling." Nivens v. Gilchrist, 444 F.3d 237, 245 (4th Cir. 2006). Here, the statute at issue is neither unclear nor presents an unsettled question of state law. See Meredith v. Talbot County, 828 F.2d 228, 231 (4th Cir.1987) (noting that "Pullman abstention . . . is appropriate where there are unsettled questions of state law that may dispose of the case and avoid the need for deciding the constitutional question"). Additionally, although defendant argues there are four cases pending in North Carolina state courts, "all of which call for an interpretation of several new statutes that regulate various aspects of state elections in anticipation of the upcoming General Election," two of which do "not differ significantly from" this case, (DE 18 at 13), the court disagrees. The two cases cited by defendant, Anglin v. Berger et al., 18-CVS-9748, and Edwards v. NC State Board of Elections et al., 18-CVS-9749, challenge Session Law 2018-130 and related laws, which, as applied in those cases, preclude the plaintiffs' party affiliation or unaffiliated status from being included on the 2018 general election ballot where plaintiffs have changed his or her party registration less than ninety days before filing a notice of candidacy. That is not the issue presently before this court.

and Holt listed on the ballot. Given the court's holding, plaintiff's motion for temporary restraining order is DENIED AS MOOT. (DE 20).

SO ORDERED, this the 22nd day of August, 2018.

_____
LOUISE W. FLANAGAN
United States District Judge